Jane DOE and James Armstrong,
M.D., Plaintiffs,

v.

Robert L. DESCHAMPS, III, Missoula
County Attorney, H. James Oleson, Flat-
head County Attorney, and Robert L.
Woodahl, Attorney General for the
State of Montana, Defendants.

No. CV 74–120–M.

United States District Court,
D. Montana,
Missoula Division.

Nov. 5, 1976.

James B. Wheelis, Datsopoulos & McDonald, Missoula, Mont., American Civil Liberties Union by Judith M. Mears, Director, Reproductive Freedom Project, ACLU, New York City, for plaintiffs.

Robert L. Woodahl, pro se.

John F. North, Thomas J. Beers, Helena, Mont., for defendant Woodahl.

Dennis E. Lind, Deputy County Atty., Missoula, Mont., for defendant Deschamps.

H. James Oleson, pro se.

Patrick M. Springer, County Atty., Kalispell, Mont., for defendants.

## ORDER and MEMORANDUM OPINION

Before BROWNING, Circuit Judge, and SMITH and JAMESON, District Judges.

### PER CURIAM:

Following the decision of this court in *Doe v. Woodahl*, 360 F.Supp. 20 (D.Mont. 1973), holding invalid Montana statutes regulating abortion, the Montana legislature in 1974 enacted the Montana Abortion Control Act, R.C.M.1947; § 94–5–613, *et seq.*, with the intent "to restrict abortion to the extent permissible under decisions of appropriate courts or paramount legislation". § 94–5–623. Plaintiff Jane Doe is a married woman who was pregnant when this action was filed. She arranged with plaintiff James Armstrong, M.D. for an abortion.

The abortion was performed in the course of Dr. Armstrong's regular medical practice. Both plaintiffs complied with the Montana Abortion Control Act. They brought this action challenging the validity of various provisions of the Act and the regulations promulgated thereunder and sought to enjoin their enforcement.

This three-judge court was convened pursuant to 28 U.S.C. § 2281. Following submission of briefs it was learned that some of the issues raised in this action were before the Supreme Court. Accordingly an order was entered on December 31, 1975 deferring submission of this case until the decisions of the Supreme Court of the United States in *Planned Parenthood of Central Missouri v. Danforth*, No. 74–1151, and *Danforth v. Planned Parenthood of Central Missouri*, No. 74–1419 became final. These were appeals by the respective parties from a judgment entered in an action instituted by Planned Parenthood of Central Missouri challenging the constitutionality of Missouri statutes on abortion. The case was decided by the Supreme Court on July 1, 1976,[1] 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788. Accordingly this court is now in a position to render its decision on the constitutionality of the questioned provisions of the Montana Act in the light of the Supreme Court guidelines on abortion regulation.

### Challenged Provisions

The plaintiffs contend that the following provisions are unconstitutional on their face:

(1) Section 94–5–616(1)—making it a misdemeanor for a physician to perform an abortion in the absence of informed consent which, as defined by § 94–5–615(3), requires the physician to certify on state supplied forms that the patient has been advised of the nature of the surgical procedure, its consequences and alternatives, and that the patient has voluntarily consented to the procedure.

---

1. On the same date the Court decided the companion case of *Singleton, Chief, Bureau of Medical Services, Department of Health and Welfare of Missouri v. Wulff et al.*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826, and *Bellotti, Attorney General of Massachusetts, et al. v. Baird et al.*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844.

(2) Section 94–5–616(2)—prohibiting any abortion to be performed unless a written notice is provided to the woman's husband, unless she is separated, or to the woman's parents if she is under 18 years of age and unmarried.

(3) Section 94–5–617(1)—providing criminal liability for any person causing the death of a viable fetus delivered during an abortion. The term "viable" is defined in § 94–5–615(5) as meaning "the ability of a fetus to live outside the mother's womb, albeit with artificial aid".

(4) Section 94–5–617(2)—providing that a premature infant who was the subject of an abortion is a dependent and neglected child and thus a ward of the state unless (a) the abortion was required to preserve the life of the mother, or (b) the parents agree within 72 hours after the abortion to accept parental rights.

(5) Section 94–5–618(1)(c)—requiring that the attending physician obtain the consent of two additional physicians before performing an abortion not necessary to save the woman's life in cases where the woman is carrying a viable fetus.

(6) Section 94–5–618(3)—prohibiting the solicitation, advertising or other communication having the purpose of inviting, inducing, or attracting a person to have an abortion or purchase abortifacients.

(7) Section 94–5–619—establishing reporting requirements for physicians and medical facilities performing abortions and requiring pathology studies and reports on aborted fetuses; and authorizing the State Department of Environmental Sciences to promulgate regulations with respect thereto.

### Supreme Court Decisions

Guidelines for determining the constitutionality of state statutes and regulations on abortion were established in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). As the Court noted in *Planned Parenthood v. Danforth*, that case is a "logical and anticipated corollary" to *Roe* and *Doe* and presented questions forecast and reserved in *Roe* and *Doe*.

In *Roe v. Wade*, the Court held invalid a state law making abortions illegal except when necessary to preserve the life of the mother. The Court found an unconstitutional interference with the woman's right of privacy which encompassed her decision of whether to terminate her pregnancy. The Court stressed, however, that the woman's right was not absolute, but rather must be balanced against the state's right to protect potential life and safeguard maternal and infant health. In balancing these interests, the Court concluded at 410 U.S. 164–66, 93 S.Ct. 732–33:

"1. A state criminal abortion statute of the current Texas type, that excepts from criminality only a *life-saving* procedure on behalf of the mother, without regard to pregnancy stage and without recognition of other interests involved, is violative of the Due Process Clause of the Fourteenth Amendment.

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother . . .

[This] decision leaves the State free to place increasing restrictions on abortion as the period of pregnancy lengthens, so long as those restrictions are tailored to the recognized state interests. The deci-

sion vindicates the right of the physician to administer medical treatment according to his professional judgment up to the points where important state interests provide compelling justifications for intervention. Up to those points, the abortion decision in all its aspects is inherently, and primarily, a medical decision, and basic responsibility for it must rest with the physician."

*Doe v. Bolton* involved the validity of a more modern abortion statute which allowed the physician to give abortions in accordance with "his best clinical judgment". The Court upheld that standard, but struck down provisions of the statute which required that (1) abortions be given only in certain accredited hospitals; (2) the hospital board of directors give approval to any abortion; and (3) two physicians in addition to the attending doctor acquiesce in the decision. The Court held that these requirements were constitutionally invalid because they failed to distinguish between the changing degree of state interests during the three trimesters of pregnancy and because they unduly infringed on the patient's and physician's rights.

In *Planned Parenthood v. Danforth* the Court resolved some of the questions left unanswered in *Roe* and *Doe* and refined further the standards set forth in those cases in ruling on the validity of a state law enacted for the express purpose of limiting abortions under the *Roe* and *Doe* guidelines.

The Court upheld the definition of fetal viability, which was framed in terms of *Roe*'s language "potentially able to live outside the mother's womb, albeit with artificial aid". 410 U.S. at 160, 93 S.Ct. at 730. The Court found constitutionally permissible a provision requiring the physician to insure that the woman gave "informed consent" to the abortion before it was performed. Also upheld were record keeping and reporting requirements which the Court found to have medical value. The Court, however, held unconstitutional four provisions of the Missouri law:

First, a provision requiring spousal consent for married women was found to be an unconstitutional attempt to delegate a veto power to a spouse which the state itself "was prohibited from exercising during the first trimester of pregnancy".

Second, for substantially the same reasons the Court found invalid a blanket parental consent requirement with respect to an under-18-year-old pregnant minor.

Third, the Court held that the State could not prohibit a specific type of abortion procedure where the regulation was not a reasonable protection of maternal health.

Fourth, a provision requiring a physician to preserve a fetus' life and health was found invalid since it did not define the physician's duty in terms of the viability of the fetus.

Although in *Planned Parenthood v. Danforth* the Court addressed new issues not raised in *Roe* and *Doe*, it was stressed throughout the opinion of the Court that the methodology set forth in the earlier decisions, which based the state's right to regulate abortions on the viability of the fetus as determined by the stage of pregnancy in which the abortion was being performed, was still the standard to be utilized in determining the constitutionality of state abortion statutes. In light of this background we turn to an analysis of the challenged provisions.

*Informed Consent Requirement*

In *Planned Parenthood v. Danforth* the Court upheld an informed consent requirement of the Missouri statute similar to §§ 94–5–616(1) and 615(3). While the Missouri statute did not go as far as the Montana statute in describing the information the physician must give his patient, it seems clear from the language of the Court that the Montana statute would also meet the constitutional test. The Court said in part:

"It is true that *Doe* and *Roe* clearly establish the State may not restrict the decision of the patient and her physician regarding abortion during the first stage of pregnancy. Despite the fact that apparently no other Missouri statute, with

the exceptions referred to in n. 6, *supra*, requires a patient's prior written consent to a surgical procedure, the imposition by § 3(2) of such a requirement for termination of pregnancy even during the first stage, in our view, is not in itself an unconstitutional requirement. The decision to abort, indeed, is an important, and often a stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences. The woman is the one primarily concerned, and her awareness of the decision and its significance may be assured, constitutionally, by the State to the extent of requiring her prior written consent.

"We could not say that a requirement imposed by the State that a prior written consent for any surgery would be unconstitutional. As a consequence, we see no constitutional defect in requiring it only for some types of surgery as, for example, an intracardiac procedure, or where the surgical risk is elevated above a specified mortality level, or, for that matter, for abortions." 428 U.S. at 66–67, 96 S.Ct. at 2840.

We hold that the provisions of §§ 94–5–616(1) and 615(3) are constitutionally valid.

### Notice Requirements
#### Spousal Notice

■ In *Planned Parenthood v. Danforth*, the Court considered a *consent* requirement rather than a *notice* requirement. The spousal consent requirement was held invalid because the Court found that requiring the husband to consent to an abortion was equivalent to giving him a veto power over the decision. The Court said, "[W]e cannot hold that the State has the constitutional authority to give the spouse unilaterally the ability to prohibit the wife from terminating her pregnancy, when the State itself lacks that right . . . Inasmuch as it is the woman who physically bears the child and who is the more directly and immediately affected by the pregnancy, as be-

tween the two, the balance weighs in her favor." The Court recognized that "It seems manifest that, ideally, the decision to terminate a pregnancy should be one concurred in by both the wife and her husband". 428 U.S. at 70–71, 96 S.Ct. at 2841–42. It was the unilateral right of veto in the husband the Court found constitutionally repugnant.

The Montana statute does not require the consent of the spouse. Section 94–5–616(2) provides:

"No abortion may be performed upon any woman in the absence of:

(a) the written notice to her husband, unless her husband is voluntarily separated from her;"

The statute does not prescribe the method of giving notice and makes no provision for constructive notice. In the absence of a provision specifying a conclusive and uncontrovertible method of giving notice, neither the pregnant woman nor the doctor could be certain that in a post-abortive action the fact that notice had been given would not be attacked and a criminal liability established. In our opinion the statute is unduly restrictive and does not afford adequate protection for either the physician or the pregnant woman seeking an abortion. In view of this conclusion, we do not reach the question of whether any notice requirement may be constitutional. We simply hold that § 94–5–616(2) as written is unconstitutional.

#### Parental Notice

■ Section 94–5–616(2)(b) requires "the written notice to a parent, if living, or the custodian or legal guardian of such woman, if she is under eighteen (18) years of age and unmarried". While the parties in their briefs argue the validity of this provision, the question was not raised in the pleadings. Obviously plaintiff Doe lacks standing to object to the provision. Since the plaintiff Armstrong did not raise the question in the complaint, we do not believe this issue is properly before the court.[2]

2. As the Court said in *Singleton v. Wulff, supra*, "Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation". 428 U.S. at 113, 96 S.Ct. at 2874.

### Criminal Liability Provision

■ Section 94–5–617(1) provides that, "A person commits the offense of criminal homicide, as defined in §§ 94–5–101 through 94–5–104, if he purposely, knowingly, or negligently causes the death of a premature infant born alive, if such infant is viable." "Viable" is defined in § 94–5–615(5) as "the ability of a fetus to live outside the mother's womb, albeit with artificial aid".

The same definition of "viable" was approved in *Planned Parenthood v. Danforth.* The Court held, however, that a statute imposing criminal liability on one who fails to exercise the proper degree of professional skill to "preserve the life and health of the fetus" was invalid, noting that the statute did not "specify that such care need be taken only after the stage of viability has been reached". The Court noted further that a "criminal failure to protect a live-born infant surely will be subject to prosecution in Missouri under the State's criminal statutes". 428 U.S. at 83–84, 96 S.Ct. at 2848.

The Montana statute is limited to an infant who is "viable". While perhaps unnecessary in view of the criminal statute on homicide, we can see no constitutional objection to § 94–5–617(1).

### Dependent and Neglected Child Provision

■ The Missouri statute construed in *Planned Parenthood* declared an infant, who survives "an attempted abortion which was not performed to save the life or health of the mother," to be "an abandoned ward of the state under the jurisdiction of the juvenile court" and that the mother—and the father too, if he consented to the abortion—"shall have no parental rights or obligations whatsoever relating to such infant". 428 U.S. at 62, n.2, 96 S.Ct. at 2838, n.2. The Court held in *Planned Parenthood* that the physician-appellants did not have standing to challenge this provision of the Missouri Act, since they did not claim any interest "sufficiently concrete" to satisfy the "case or controversy" requirement, citing *Singleton v. Wulff.* The district court had not decided whether Planned Parenthood had standing to challenge the Act, and the Court left this question to the district court for reconsideration on remand.

Under the holding in *Planned Parenthood*, plaintiff Armstrong clearly lacked standing to challenge § 94–5–617(2). Nor is there any showing that plaintiff Doe would be affected in any way by this provision of the statute. We hold accordingly that neither plaintiff had standing to question this section.

### Physician Concurrence in Late Term Abortion

■ Section 94–5–618(1)(c) provides that no abortion may be performed "[a]fter viability of the fetus, unless in 'appropriate medical judgment the abortion is necessary to preserve the life or health of the mother". The physician is required to set forth in detail the facts upon which he relies in making his judgment, and two other licensed physicians must examine the patient and "concur[red] in writing with such judgment". Plaintiffs challenge the requirement for concurrence of two other physicians.

As noted *supra*, it was held in *Roe v. Wade* that for the "stage subsequent to viability" the State may regulate and even proscribe abortion "except where it is necessary, in *appropriate medical judgment,* for the preservation of the life or health of the mother". (Emphasis added.) 410 U.S. at 164–165, 93 S.Ct. at 732. In *Doe v. Bolton*, the Court held unconstitutional a requirement for the concurrence of two physicians in all abortions. The Court recognized that, "Time, of course, is critical in abortion" and "Risks during the first trimester of pregnancy are admittedly lower than during later months". In holding the concurrence requirement invalid the Court said:

> "The statute's emphasis, as has been repetitively noted, is on the attending physician's 'best clinical judgment that an abortion is necessary.' That should be

sufficient. . . . If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies. Required acquiescence by co-practitioners has no rational connection with a patient's needs and unduly infringes on the physician's right to practice. The attending physician will know when a consultation is advisable—the doubtful situation, the need for assurance when the medical decision is a delicate one, and. the like." 410 U.S. at 199, 93 S.Ct. at 751.

Standing alone, this language in *Doe* suggests that any requirement for the concurrence of additional physicians would be invalid. As the Court stated in *Roe*, however, the opinions in *Doe* and *Roe* must be read together. In *Roe* the Court continued in part:

".  .  . The decision vindicates the right of the physician to administer medical treatment according to his professional judgment up to the points where important state interests provide compelling justifications for intervention." 410 U.S., at 165–166, 93 S.Ct. at 733.

Moreover, it may be noted that in *Roe* the Court uses the phrase "appropriate medical judgment" in prescribing guidelines for the "stage subsequent to viability", whereas in referring to the "stage prior to approximately the end of the first trimester" the Court uses the phrase "medical judgment of the pregnant woman's attending physician". 410 U.S. at 164–165, 93 S.Ct. at 732.

The requirement of the Montana Act for concurrence of two physicians is limited to the period "after viability of the fetus".[3] While a close question is presented and plausible arguments may be made in support of either position, on balance and considering the decisions of the Supreme Court as a whole, we conclude that the Montana

statute is permissible under the language used in *Roe.*

■ Up to the point of fetal viability the abortion decision must be left to the pregnant woman and her attending physician with but the minimal kind of State regulation approved in this opinion. After the fetus becomes viable, however, the emphasis switches, and the concern is for the preservation of the "potentiality of life" compatible with the health of the mother. "State regulation protective of fetal life after viability thus has both logical and biological justifications." *Roe,* 410 U.S. at 163, 93 S.Ct. at 732. The will of the woman and her physician are no longer of primary consideration. Medical judgments may vary greatly in this complex area, and the State may properly require more than the opinion of the woman's attending physician to insure that the potentiality of life is not destroyed.

We hold that § 94–5–618(1)(c) is constitutionally valid.

### Prohibiting Solicitation and Advertising

■ Section 94–5–618(3) of the Montana Act provides that, "No physician, facility, or other person or agency shall engage in solicitation, advertising, or other form of communication having the purpose of inviting, inducing, or attracting any person to come to such physician, facility, or other person or agency to have an abortion or to purchase abortifacients".

In *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), the Court construed a Virginia statute providing that, "If any person, by publication, lecture, advertisement, or by the sale or circulation of any publication, or in any other manner, encourage or prompt the procuring of abortion or miscarriage, he shall be guilty of a misdemeanor". The Court reversed a judgment of the Supreme Court of Virginia

---

**3.** The Georgia statute held invalid in *Doe* is distinguishable from the Montana statute in two respects: (1) the Georgia statute provided that an abortion was not criminal if performed pursuant to a physician's "best clinical judgment that an abortion is necessary", whereas

the Montana statute requires "appropriate medical judgment"; and (2) the Georgia statute covered abortions at all stages of pregnancy, whereas Montana's statute is limited to the trimester after viability, when the State's interest is most compelling.

upholding the conviction of the managing editor of a newspaper which published an advertisement of a New York organization announcing that it would arrange low-cost placements for women with unwanted pregnancies. The Court concluded that Virginia could not apply its statute "to appellant's publication of the advertisement in question without unconstitutionally infringing upon his First Amendment rights".[4] 421 U.S. at 829, 95 S.Ct. at 2236.

We conclude that § 94–5–618(3) is unconstitutional.

### Recordkeeping and Reporting Requirements

In *Planned Parenthood* the Court, in upholding recordkeeping and reporting provisions of the Missouri Act, held that, "Recordkeeping and reporting requirements that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible". The Court added these words of caution:

"We naturally assume, furthermore, that these recordkeeping and record-maintaining provisions will be interpreted and enforced by Missouri's Division of Health in the light of our decision with respect to the Act's other provisions, and that, of course, they will not be utilized in such a way as to accomplish, through the sheer burden of recordkeeping detail, what we have held to be an otherwise unconstitutional restriction." 428 U.S. at 80–81, 96 S.Ct. at 2846–2847.

While the recordkeeping and reporting provisions of § 94–5–619 of the Montana Act are more detailed than similar provisions of the Missouri Act, we conclude that they are constitutionally permissible. We assume, as did the Supreme Court in *Planned Parenthood*, that they will not be administered in an unduly burdensome manner.

### Conclusion

In summary, we hold that the following provisions of the Montana statute are constitutionally valid:

(1) § 94–5–616(1) and 615(3) relating to informed consent.

(2) § 94–5–617(1) relating to the offense of criminal homicide.

(3) § 94–5–618(1)(c) relating to physician concurrence in late abortions.

(4) § 94–5–619 relating to recordkeeping and reporting.

We hold, for the reasons stated, that the following provisions are unconstitutional:

(1) § 94–5–616(2)(a) relating to spousal notice.

(2) § 94–5–618(3) relating to soliciting and advertising.

We hold that neither plaintiff has standing, to challenge § 94–5–617(2) relating to dependent and neglected children; and that the question of the constitutionality of § 94–5–616(2)(b) is not properly before the court.

---

4. The Court held that the fact that the advertisement "had commercial aspects or reflected the advertiser's commercial interests did not negate all First Amendment guarantees", 421 U.S. at 818, 95 S.Ct. at 2231, and that, "Viewed in its entirety, the advertisement conveyed information of potential interest and value to a diverse audience", including "readers possibly in need of the services offered". *Id.* at 822, 95 S.Ct. at 2232.