**PLANNED PARENTHOOD OF RHODE ISLAND, et al.**

v.

**BOARD OF MEDICAL REVIEW, et al.**

**Civ. A. No. 82–0391 P.**

United States District Court,
D. Rhode Island.

Nov. 19, 1984.

Lynette Labinger, Providence, R.I., Nan D. Hunter, A.C.L.U., New York City, for plaintiffs.

Joseph F. Dugan, Rhode Island Atty. Gen.'s Dept., Providence, R.I., for defendants.

## OPINION

PETTINE, Senior District Judge.

This is a class action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 challenging the constitutional validity of Rhode Island General Laws, Chapter 23–4.8 entitled "Spousal Notification for Abortion."[1] The Act requires a physician

1. Rhode Island's "Spousal Notification for Abortion" statute provides as follows:

23–4.8–1. Declaration of purpose.—The purpose of this chapter is to promote the state's interest in furthering the integrity of the institutions of marriage and the family.

23–4.8–2. Spousal notice requirements.—If a married woman consents to an abortion, as such consent is required by chapter 4.7 of this title, the physician who is to perform the abortion or his authorized agent shall, if reasonably possible, notify the husband of such woman of the proposed abortion before it is performed.

23–4.8–3. Exceptions.—The requirements of § 23–4.8–2 shall not apply if:

(9) The woman having the abortion furnishes to the physician who is to perform the abortion or his authorized agent prior to the abortion being performed a written statement that she has given notice to her husband of the proposed abortion; or a written statement that the fetus was not fathered by her husband; or

(b) The woman or her husband are living separate and apart, or, if either spouse has filed a petition or complaint for divorce in a court of competent jurisdiction; or

(c) The physician who is to perform the abortion or his authorized agent receives the written affirmation of the husband that he has been notified of the proposed abortion; or

(d) Where there is an emergency requiring immediate action. In such case the woman's attending physician shall certify in writing on the patient's medical record that such emergency exists and the medical basis for his opinion.

23–4.8–4. Penalties.—In the event a physician performs an abortion, as defined by chapter 4.7 of this title, upon a woman whom he knows is married, and such physician knowingly and intentionally violates the requirements of this chapter he shall be guilty of "unprofessional conduct" for the purposes of § 5–37.1–5.

23–4.8–5. Severability.—If any section or provision of this chapter or the application

thereof is held invalid, such invalidity shall not affect other sections, provisions or applications, and to this end the sections and provisions of this chapter are hereby declared severable.

The Spousal Notice for Abortion Statute amends Rhode Island General Laws, Chapter 5–37.1–5 as follows:

5–37.1–5. Unprofessional conduct.—The term "unprofessional conduct" as used in this chapter shall mean the following items or any combination thereof which may be further defined by regulations established by the board of medical review:

(1) fraudulent or deceptive procuring or use of a license or limited registration;

(2) all advertising of medical business which is intended or has a tendency to deceive the public;

(3) conviction of a crime involving moral turpitude; conviction of a felony; conviction of a crime arising out of the practice of medicine;

(4) abandonment of a patient;

(5) addiction to narcotics, habitual drunkenness or rendering professional services to a patient while the physician or limited registrant is intoxicated or incapacitated by the use of drugs;

(6) promotion by a physician or limited registrant of the sale of drugs, devices, appliances, or goods or services provided for a patient in such manner as to exploit the patient for the financial gain of the physician or limited registrant;

(7) immoral conduct of a physician or limited registrant in the practice of medicine;

(8) willfully making and filing false reports or records in the practice of medicine;

(9) willful omission to file or record, or willfully impeding or obstructing a filing or recording, or inducing another person to omit to file or record medical reports as required by law;

(10) failure to furnish details of a patient's medical record to succeeding physicians or hospitals upon proper request. Proper request shall be defined to mean only on a

who is planning to perform an abortion to notify the patient's husband of the proposed procedure, if "reasonably possible," before it is performed. This duty to notify the spouse is subject to several enumerated exceptions. The plaintiff alleges that the statute violates rights secured by the First, Fourth, Ninth, and Fourteenth Amendments to the United States Constitution.

## I. Factual Background

The named plaintiffs in this action are Planned Parenthood of Rhode Island (PPRI), Marshall Taylor, M.D., and Lynn Lowe, M.D. PPRI is a non-business corporation which operates a licensed health care facility in Providence, Rhode Island. The facility provides family planning and birth control services, including, but not limited to, abortions for married women. Doctors Taylor and Lowe are practicing, licensed Rhode Island physicians who specialize in obstetrics and gynecology. In the past, they have performed abortions on women, including married women, and they wish to perform such procedures in the future. The doctors represent themselves and the

class of all Rhode Island physicians similarly situated.

The defendants in this case are the Board of Medical Review of the State of Rhode Island ("Board"), Stephen V. Hoie, Seth K. Gifford, and Margaret Joyce Diamond. The Board is the state agency responsible for the enforcement of the spousal notification provisions of R.I.G.L. Chapter 23–4.8 and R.I.G.L. Sec. 5–37.1–5(23) as amended in 1982. The named individual defendants are the Chairman, Secretary, and Executive Director of the Board.

On May 18, 1982, the Rhode Island General Assembly enacted the spousal notification provisions. The enactment was to go into effect on July 1, 1982. On June 18, 1982, however, counsel in this action consented to the entering of a temporary restraining order which suspended enforcement of the statute during the pendency of the case.

The statute provides that if a married woman consents to an abortion, "the physician who is to perform the abortion or his authorized agent shall, if reasonably possible, notify the husband of such woman of

patient's signed release and upon reimbursement of reasonable costs for reproducing said materials;

(11) solicitation of professional patronage by agents or persons or profiting from acts of those representing themselves to be agents of the licensed physician or limited registrants;

(12) division of fees or agreeing to split or divide the fees received for professional services for any person for bringing to or referring a patient;

(13) agreeing with clinical or bioanalytical laboratories to make payments to such laboratories for individual tests or test series for patients unless the physician or limited registrant discloses on the bills to patients the name of such laboratory, the amount or amounts paid to such laboratory for individual tests or test series and the amount of his processing charge or procurement, if any, for each specimen taken;

(14) willful misrepresentation in treatments;

(15) practicing medicine with an unlicensed physician except in an accredited preceptorship or residency training program, or aiding or abetting such unlicensed persons in the practice of medicine;

(16) violation of the patient's bill of rights set forth in § 23–17–19.1;

(17) gross and willful and continued overcharging for professional services; including filing of false statements for collection of fees for which services are not rendered;

(18) offering, undertaking or agreeing to cure or treat disease by a secret method, procedure, treatment or medicine;

(19) failure to maintain standards established by peer review board including but not limited to standards related to proper utilization of services and use of non-accepted procedure;

(20) professional or mental incompetency;

(21) incompetent, negligent or willful misconduct in the practice of medicine which shall include any departure from or the failure to conform to the minimal standards of acceptable and prevailing medical practice in his area of expertise as shall be determined by the board. The board need not establish actual injury to the patient in order to adjudge a physician or limited registrant guilty of the above named conduct;

(22) failure to comply with the provisions of chapter 4.7 of title 23;

(23) failure to comply with the provisions of chapter 23–4.8.

the proposed abortion before it is performed." R.I.G.L. Sec. 23–4.8–3. The Act exempts the doctor from the notification obligation if one of four circumstances exists. Notification is not required if: the woman gives the physician either a written statement declaring she has previously given notice to her husband or a statement declaring that her husband is not the father of the fetus; the woman and her husband are separated or have filed for divorce; the doctor receives a written statement from the husband that he has been notified; or there is an emergency requiring immediate action. R.I.G.L. Sec. 23–4.8–3. Doctors who violate the requirements of the spousal notification law shall be guilty of "unprofessional conduct" within the meaning of R.I.G.L. Sec. 5–37.1–5. R.I.G.L. Sec. 23–4.8–4. These physicians are therefore subject to penalties which include suspension or indefinite revocation of their license to practice medicine. R.I.G.L. Sec. 5–37.1–13.

In the course of their normal practice, the plaintiffs in this action provide medical services, including abortions, to married women. These patients include married women who have not notified their husbands of their decision to have an abortion, do not wish to do so, and do not fall within any of the exceptions to the notification requirement of the Rhode Island law. The plaintiffs assert that the Rhode Island law violates their patients' right to privacy in the abortion decision and to the equal protection of the laws.

## II. Standing

■ The plaintiffs in this case clearly have standing to raise the constitutional rights of their patients. In *Singleton v. Wulff,* 428 U.S. 106, 109, 96 S.Ct. 2868, 2871, 49 L.Ed.2d 826 (1976), the United States Supreme Court held that physicians had standing to challenge a Missouri statute which excluded abortions that were not "medically indicated" from the purposes for which medicaid benefits are available to needy persons. The doctors, of course, properly asserted injury-in-fact since the statute threatened them with an actual pe-

cuniary loss of business. *Id.* at 112–13, 96 S.Ct. at 2873. In addition, however, the Court found that because a patient's constitutionally protected abortion decision is one in which the physician is intimately involved, "the physician is uniquely qualified to challenge the constitutionality of the State's interference with, or discrimination against, that decision." *Id.* at 117, 96 S.Ct. at 2875. The holding in *Singleton* is fully applicable to the instant case.

## III. The Right to Privacy Claim

### A. Applicable Legal Standard

In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court of the United States explicitly recognized that an individual's constitutionally protected fundamental right to privacy extends to a woman's decision to terminate her pregnancy. This right is grounded in the Due Process Clause's guarantee of liberty, which has long been understood to secure the freedom of personal choice in matters of procreation and marriage. *Roe,* 410 U.S. at 169, 93 S.Ct. at 734. The holding of *Roe* was recently reaffirmed in *City of Akron v. Akron Center for Reproductive Rights,* 462 U.S. 416, 103 S.Ct. 2481, 2487, 76 L.Ed.2d 687 (1983). That case reiterated and clarified the analytical test that courts must apply to determine the constitutionality of state regulations that touch and concern the fundamental right to have an abortion.

■ A constitutionally recognized fundamental right, while it is to be carefully guarded, is not unqualified. *See Roe,* 410 U.S. at 154–55, 93 S.Ct. at 727 (right to an abortion is not absolute). A state, in the responsible exercise of its police power, may be obligated to pass legislation which in some manner implicates an individual's exercise of a fundamental right. *Id.* at 154–57, 93 S.Ct. at 727–28. The state, however, must act only within the permissible boundaries of the federal Constitution. In determining the validity of any state abortion regulation, the Court must first in-

quire whether the challenged regulation has a significant impact on the free exercise of the protected right. *Akron,* 103 S.Ct. at 2492. Put another way, it must be determined whether the statute imposes a non-*de minimus* burden on that right. *Women's Medical Center of Providence v. Roberts,* 530 F.Supp. 1136, 1144 (D.R.I. 1982). If the law does not actually interfere with a woman's decision to have an abortion, it will be upheld if it is rationally related to an important state interest. *Akron,* 103 S.Ct. at 2493. If the state regulation burdens the right, however, it will be upheld only if it furthers a compelling state interest. *Id.* at 2491. In addition, the challenged statute must be legitimately related to the compelling state objective. *Id.* at 2493; *Doe v. Bolton,* 410 U.S. 179, 194–195, 93 S.Ct. 739, 748–49, 35 L.Ed.2d 201 (1973).[2]

### B. *Propriety of Certification to the Rhode Island Supreme Court*

The defendants have urged this Court to certify to the Supreme Court of Rhode Island certain questions regarding the proper interpretation of the Rhode Island spousal notification law. They argue that the Supreme Court could feasibly give the statute a construction that would obviate the need to reach the constitutional questions presented by this case. I disagree.

■ It is certainly true that the fundamental issue in this case—whether a state may constitutionally require a physician to notify his or her patient's husband of an impending abortion procedure—is an important question of federal law which has not yet been addressed by the Supreme Court of the United States.[3] Before reaching these constitutional issues, it is this Court's obligation to examine any potentially dispositive questions of state law. If the state law is unsettled, the court should abstain from hearing the federal question until the state court has rendered an authoritative interpretation. *Railroad Commission of Texas v. Pullman,* 312 U.S. 496, 500–501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). Abstention may be particularly appropriate where, as in Rhode Island, a relatively speedy certification procedure has

---

**2.** I believe that this is an accurate statement of the constitutional standard fashioned in *Roe* and still employed today. Several cases of the United States Supreme Court decided after *Roe* have framed the constitutional inquiry in terms of whether a statute "unduly burdens" a woman's fundamental right to an abortion. *See e.g., Maher v. Roe,* 432 U.S. 464, 473, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977); *Bellotti v. Baird,* 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976). The term "undue burden" as used in these cases, however, refers to the ultimate constitutional issue rather than the threshold requirement for strict constitutional scrutiny. *Accord, Charles v. Carey,* 627 F.2d 772, 777 (7th Cir.1980). Thus, the right to an abortion is "unduly burdened" if the challenged law imposes a *significant burden or impact* on the right and the burdening regulation is not reasonably drawn to further a compelling state interest.

**3.** As of this time, the United States Supreme Court has invalidated a state statute requiring a husband's consent to a woman's abortion, *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) and a statute requiring parental consent for abortions performed on minors. *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1970); *Danforth, supra.* More recently, the Supreme Court

upheld a state requirement that parents of a minor be notified of an impending abortion. *H.L. v. Matheson,* 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981). The holding, however, was explicitly limited to the application of the statute to immature and unemancipated minors. *Id.*

Several lower federal courts have entertained constitutional challenges to spousal notification, with divergent disposition of the issues requirements. A Florida statute was held by a federal district court to violate the right to privacy defined in *Roe. Scheinberg v. Smith,* 482 F.Supp. 529 (S.D.Fla.1979). The United States Court of Appeals for the Fifth Circuit reversed the pertinent portion of the district court's holding on the grounds that the state had demonstrated a compelling state interest. *Scheinberg v. Smith,* 659 F.2d 476 (5th Cir.1981). Conversely, the United States District Court for the Western District of Kentucky struck down a spousal notification provision as violative of *Roe. Eubanks v. Collins,* Mem.Op. No. 82–0360 L(A) (W.D.Ky. Sept. 11, 1984). In *Doe v. Deschamps,* 461 F.Supp. 682 (D.Mon.1976), the district court invalidated a notification statute on the ground that the law did not specify a conclusive method of giving notice, thereby forcing a physician to speculate on the extent of the duty imposed by the law. *Id.* at 686.

been available in most cases.[4]  *Berkshire Cablevision of Rhode Island v. Burke*, No. 83–1800, slip op. at 3 (1st Cir. May 4, 1984).

The propriety of abstention, however, must be viewed in light of a federal court's affirmative duty to adjudicate controversies properly before it.  The abstention doctrine creates " 'an extraordinary and narrow exception' " to that duty.  *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 812, 96 S.Ct. 1236, 1243, 47 L.Ed.2d 483 (1976), (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 186, 188–189, 79 S.Ct. 1060, 1062, 1063, 3 L.Ed.2d 1163 (1959)).  *Pullman* type abstention, therefore, is appropriate only if the state law in question is ambiguous in some *material* way.  *Dionne v. Bouley*, 583 F.Supp. 307, 310 (D.R.I.1984).  The unconstrued state statute must be susceptible to an interpretation "which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem."  *Bellotti v. Baird*, 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976) (quoting *Harrison v. NAACP*, 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959)).

Similarly, the certification procedure set forth in Rhode Island's Supreme Court Rule 6 is unavailable where an interpretation of state law could not potentially *dispose of the entire case* before the federal court.  The Rule provides in pertinent part:

> [The Supreme Court of Rhode Island] may answer questions of law certified to it by ... a district Court of the United States ... when requested by the certifying court if there are involved in any proceedings before it questions of law of this state *which may be determinative of the cause then pending in the certifying court* and as to which it appears to the certifying court that there is no controlling precedent in the decisions of [the Supreme Court of Rhode Island].

The defendants in this case point to two potentially ambiguous provisions in the Rhode Island Spousal Notification Statute which they urge could plausibly be interpreted to avoid the constitutional issues.  First, they argue that the provision directing the physician to notify the husband of an impending abortion if "reasonably possible" could be interpreted to require a *de minimus* effort such as attempting one phone call.  They contend that under such an interpretation, the statute could not be held to place an unconstitutional burden on a woman's right to freely make the abortion decision.  Second, the defendants argue that the emergency exception to the notification directive could be construed to waive the requirement entirely if, in the judgment of the physician, the woman might be subject to physical or emotional abuse if her husband were notified.  Such a construction, it is argued, would obviate the need to reach the constitutional questions.

Without deciding whether defendants' construction of the emergency provision could, in fact, avoid the constitutional issues in this case, I simply hold that such an interpretation is implausible.  On the face of the statute, the emergency provision applies only to medical emergencies, since the physician must document the emergency on

---

4.  Under *Pullman* type abstention, the federal court retains jurisdiction over the federal issues in the case, but directs the parties to obtain a ruling on the state issue from the state courts.  The parties may, however, make a reservation on the state record to the disposition of the entire case in state court, and return to the federal court later for disposition of the federal claims.  *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).  This procedure requires the plaintiff to proceed through the entire state appellate process and then begin again in federal court, and engenders a great deal of delay in the resolution of legal disputes.  As a partial solution to the delay created by the *Pullman/England* doctrine, the Supreme Court has endorsed the use of state certification procedures where abstention is appropriate.  *See Lehman Brothers v. Schein*, 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974).  While certification certainly does not eliminate the delay inherent in federal abstention, it does reduce it by permitting a federal court to certify state law questions directly to the highest state tribunal.

the patient's *medical* record. *See* R.I.G.L. Sec. 23–4.8–3(d).

I also reject defendants' contention that an interpretation of the "reasonably possible" language could dispose of the constitutional question. I hold that any unresolved state law questions as to the precise parameters of a physician's duty to notify the spouse are not properly certifiable to the Rhode Island Supreme Court. This conclusion is not only mandated by established federal case law on abstention principles, but also by the prerequisites to certification set out by the Rhode Island Supreme Court itself. Although I recognize that certain directives within the spousal notification statute could arguably contain some ambiguities, and that the law has not yet been construed by the Rhode Island courts, the least restrictive interpretation of those provisions simply would not moot the important constitutional questions now before this Court. Given this fact, not only is certification precluded by the clearly articulated conditions of Rhode Island Supreme Court Rule 6, but certification under these conditions " 'wastes the plaintiff's, the defendant's and the state court's time and causes unseemly delay in the federal court adjudication.' " *Dionne, supra,* 583 F.Supp. at 310 (quoting *Moe v. Dinkins,* 635 F.2d 1045, 1048 (2d Cir.1980)) *cert. denied sub. nom Axelrod v. Coe,* 459 U.S. 827, 103 S.Ct. 61, 74 L.Ed.2d 64 (1982).

The Supreme Court has authorized the invocation of *Pullman* type abstention only if a state interpretation of its own unsettled law would moot a constitutional issue or change the very nature of the problem facing the federal court. *Bellotti,* 428 U.S. at 152–153, 96 S.Ct. at 2868. An authoritative interpretation of the spousal notification law would do neither of these things. First, even if the notification requirement were interpreted as the defend-

ants urge it could be—to require the notifying physician to make only one attempted telephone call—the basic question of whether such a requirement is an unconstitutional limitation on a woman's right to an abortion would certainly not be obviated. This Court would still have the duty to decide whether this supposedly less restrictive requirement imposed a constitutionally significant burden on a patient's right to privacy so as to trigger strict scrutiny of the legislature's action.[5]

Several First Circuit cases illustrate the unique circumstances under which certification or abstention is appropriate. That court has sanctioned the withholding of federal jurisdiction if the state law could conceivably be interpreted to absolutely forbid the conduct which is alleged to violate a federal right. In *Berkshire Cablevision, supra,* for example, the First Circuit certified to the Rhode Island Supreme Court the question of whether certain regulations of the Rhode Island Division of Public Utilities were within the Division's statutorily conferred regulatory authority. *Berkshire Cablevision,* No. 83–1800 at 2–4. The regulations were being challenged in federal court on First and Fourteenth Amendment grounds. The First Circuit concluded that a state court finding that the Division's regulations were *ultra vires* would have totally obviated the need to reach the constitutional questions. *See also, Jefferson v. Moran,* 563 F.Supp. 227 (D.R.I.1983) (in Fourteenth Amendment case attacking constitutionality of administrative regulations, the validity of regulations under state law is properly certifiable).

Similarly, in *Santasucci v. Gallen,* 607 F.2d 527 (1st Cir.1976), the First Circuit upheld a district court's abstention decision on the grounds that the resolution of the

---

**5.** The defendants' certification argument seems to assume that delay in the performance of an abortion is the only constitutionally significant burden that could result from the enforcement of the Rhode Island law. A burden on the right to an abortion may take many forms—an increase in the cost of the procedure, an increase in the risk to the woman, a compulsion to travel to obtain an abortion, and other incidental burdens. *See Women's Medical Center of Providence v. Roberts,* 530 F.Supp. 1136, 1146 (D.R.I. 1982). Even if the statute were to be interpreted as not causing a delay in the performance of an abortion, I would still have to determine the existence of other types of constitutionally significant burdens.

constitutional claims turned entirely on a question of state law. *Id.* at 529. In that case, the plaintiffs sought a declaration that certain property, on which the plaintiffs wished to march and demonstrate, had not lawfully been conveyed from a municipality to a private corporation. Accordingly, they further sought an injunction preventing the corporation from infringing on its First Amendment right to use the land for demonstrations. *Id.* at 528. Clearly, the First Amendment claim would be mooted by a state court finding that the title to the property passed under applicable state law to the private entity. Under these decisions, certification to the Rhode Island Court for interpretation of the spousal notification law is inappropriate since there is no possible construction of its provisions which could avoid any of the constitutional issues.

There is also no conceivable construction of the law which could materially alter the nature of the question before this court within the meaning of *Bellotti, supra.* *Bellotti* involved a challenge to the constitutionality of a Massachusetts statute which required parental consent be given for an abortion performed on a minor. *Bellotti,* 428 U.S. at 134–35, 96 S.Ct. at 2860. The Supreme Court found that it was unclear on the face of the statute whether the law allowed for an absolute parental veto of a minor's abortion decision or whether it provided for less restrictive mechanisms of insuring informed consent. Consequently, the Court certified the question to the Supreme Judicial Court. *Bellotti,* 428 U.S. at 152–153, 96 S.Ct. at 2868. In *Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), decided the same day as *Bellotti,* the Court struck down a statute that created a parental veto. *Id.* at 72–75, 96 S.Ct. at 2842–43. Certification afforded the state court an opportunity to give the statute an interpretation which might save it from constitutional infirmity. In addition, a construction that the statute did allow a parental veto, while not negating the constitutional issue, would relieve the court of the necessity of deciding a novel constitutional question.

Unlike the Massachusetts statute in *Bellotti,* the Rhode Island law is not susceptible to a construction which would change the nature of the statutory mandate, and thus the very character of the question before this court. The law is indisputably one requiring spousal notification of an abortion and it could not possibly be interpreted otherwise. The provision which the defendants urge is ambiguous and does not speak to the existence of the physician's obligation to notify the husband, but only to the degree of diligence and persistence he is legally required to exercise. Under any construction, the basic constitutional question remains the same—is a spousal notification requirement an unconstitutional burden on a woman's right to obtain an abortion.

### C. *Does the Spousal Notification Law Burden the Fundamental Right to an Abortion*

The threshold question in analyzing the validity of Rhode Island's spousal notification law is whether the requirement burdens or directly interferes with a woman's fundamental right to terminate her pregnancy. *Charles v. Carey,* 627 F.2d 772, 777 (7th Cir.1980); *Women's Medical Center,* 530 F.Supp. at 1143–44 n. 5. If the statute does impose a burden, then the state must offer more than a mere rational basis for the regulation; it must demonstrate a compelling state interest which is legitimately furthered by the challenged law. First, I conclude that any statute which requires a physician to notify a third party of his or her patient's abortion decision is, as a matter of law, a constitutionally significant burden on a woman's right to an abortion. But even if the statute were not burdensome on its face, the evidence of this case establishes that the enforcement of the law would result in a severe impact on and interference with the abortion decision which unquestionably would trigger strict judicial scrutiny.

As a matter of law, any state regulation which obstructs the decision of a woman and her doctor to proceed with an abortion burdens the woman's fundamental right. The Court has distinguished such laws from ones which merely legislate in the area protected by the right. *Harris v. McRae*, 448 U.S. 297, 308, 314, 100 S.Ct. 2671, 2683, 2686, 65 L.Ed.2d 784 (1980). It has held that regulations having no significant impact on a woman's exercise of her right to abortion are permissible if justified by important state health objectives. *Akron, supra*, 103 S.Ct. at 2492–93. Thus, requirements of written consent and particular recordkeeping procedures which are not required for comparable medical procedures have been upheld on the basis that they were simply not burdensome. *Id.* at 2493, (citing *Danforth, supra*, 428 U.S. at 65–67, 96 S.Ct. at 2839–40). The Court has also upheld state and federal welfare and insurance regulations which withhold public funding for abortion. *Harris, supra*, 448 U.S. at 320, 100 S.Ct. at 2689; *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1976). It has reasoned that such statutes do not affirmatively obstruct the right to an abortion, but merely decline to facilitate abortions through the provision of public monies. *Harris*, 448 U.S. at 313–317, 100 S.Ct. at 2686–88.

But any regulation, no matter how minor, if it interferes with either the patient-physician consultation or with a woman's choice between abortion and childbirth, is a constitutionally significant burden on a woman's fundamental right to an abortion. *See Akron*, 103 S.Ct. at 2493. The pivotal inquiry is whether the challenged law places an obstacle, absolute or otherwise, in the path of a woman's free exercise of her decision. *Maher, supra*, 432 U.S. at 474, 97 S.Ct. at 2382. This concept of "burden" extends to forms of interference which are far more subtle than the absolute prohibition of abortions or laws permitting spousal or parental veto of a woman's abortion decision. *See e.g., Roe, supra*, 410 U.S. at 113, 93 S.Ct. at 705 (striking down state ban on induced abortions); *Danforth, supra*, 428 U.S. at 52, 96 S.Ct.

at 2831 (striking down parental and spousal veto provisions). Indeed, the Supreme Court has held burdensome certain local ordinances requiring that a woman be given specified information on health risks and fetal development prior to the abortion procedure, and that that information be given only by the attending physician. *Akron*, 103 S.Ct. at 2481. To constitute a legally significant burden, therefore, a state regulation need not forbid abortion or give another the power to do so; it must merely have the potential to frustrate or delay a woman's abortion decision. The Rhode Island spousal notification law, on its face, has this potential.

My conclusion that a notice requirement interferes with the abortion decision as a matter of law is supported by the Supreme Court's opinion in *H.L. v. Matheson*, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1980). *Matheson* upheld a Utah parental notice requirement as it applied to a class of unemancipated, immature minors. *Id.* at 413, 101 S.Ct. at 1173. Although the Court held that the statute did not violate the constitutional rights of the plaintiffs in that case, it did so not because it concluded that the notice requirement did not burden the right to an abortion, but because, in that discrete situation, there were compelling state interests which justified the regulatory interference. *Id.* at 409–413, 101 S.Ct. at 1171–73. Thus by analyzing the Utah statute in terms of whether it was narrowly tailored to serve a compelling state interest, the Court implicitly recognized that a notice requirement is a *per se* burden on the right to an abortion. A finding that a statute has an impact on the exercise of a fundamental right is a prerequisite to that line of constitutional inquiry. *Id.* at 421, 101 S.Ct. at 1177 (Stevens, J., concurring in the judgment).

Even if a third party notification requirement were not to be considered burdensome as a matter of law, the evidence presented in this case demonstrates that Rhode Island's spousal notification law, if enforced, will have the effect of delaying or totally frustrating a woman's decision to

terminate her pregnancy. These potential effects are far more severe than the minimal burdens which are sufficient to trigger strict scrutiny of the law. They are profound interferences which threaten any meaningful exercise of the right to an abortion.

The plaintiffs have submitted evidence through the affidavits of their experts[6] showing that the notification requirement will often result in a significant delay in the performance of the abortion procedure. Even assuming, as the defendants have urged, that the statute requires only that the physician attempt one telephone call to the spouse, I find that there is a real probability that significant delay would occur. First, it is likely that a woman who has chosen not to share her abortion decision with her husband, upon being informed of the notification requirement, will decide to notify her spouse herself. Affidavit of Lowe.[7] This would necessarily involve a minimal delay in the procedure, but more importantly, if discussion of the issue between the husband and wife ensued, the ultimate decision could be delayed for days and even weeks. Affidavit of Good. The likelihood of such a delay is underscored by the fact that the state's own justification for the legislation is precisely to encourage thoughtful, and perhaps necessarily protracted, marital consultation on the abortion decision. *See* R.I.G.L. Sec. 23–4.8–1.

Any delay in the effectuation of a woman's abortion decision, no matter how brief, obviously interferes with the free exercise of her rights. In *Akron, supra,* the Supreme Court held that a delay of only twenty-four hours is a burden on the right to an abortion which requires a compelling state justification. *Akron,* 103 S.Ct. at 2503. Furthermore, if the patient's forced consultation with her husband results in delaying the procedure for a week or more, the risk

associated with the abortion would increase to a statistically significant degree. Even a very brief postponement of the decision to go ahead with the abortion could have the same deleterious consequences since scheduling factors at Rhode Island abortion facilities may transform a twenty-four hour delay in a woman's decision into a delay of a week or more in rescheduling the procedure. *See Women's Medical Center, supra,* 530 F.Supp. at 1146.

Rhode Island's spousal notification requirement also opens the door to total frustration of a woman's personal and unilateral decision to have an abortion. Uncontroverted expert opinion offered in this case demonstrates that in the very situations where notification of the husband will be required, it is possible that a number of such husbands, after learning of their wives' plans, will exert physical or emotional pressure to coerce their wives to forego the abortion entirely. Affidavit of Gelles.

Mature married couples with healthy, stable relationships typically make joint decisions about abortions and a law requiring notification of the husband would be unnecessary for such couples. Affidavit of Good. Thus, when a woman has chosen not to communicate with her husband concerning her abortion decision, it is often due to the fragile or strained nature of the marital relationship. The wife in such a marriage may fear or avoid consultation with her husband for a number of reasons including an imbalance of decision-making power within the marital relationship; fear of physical abuse; extreme dissention regarding religious or moral values; and a variety of other communication barriers. *Id.* In this type of dysfunctional marriage, the parties agree that forced notification may result in the husband physically abusing his wife, or exerting psychological or economic coercion to prevent the abortion

---

6. The parties have agreed to permit this Court to consider the suit as submitted on the merits by affidavit, in lieu of live testimony.

7. In addition to the opinions of the plaintiffs' medical and counseling experts, my findings are supported by the stipulation of the parties

which provides that if the defendant's expert, Dr. Rue, were called as a witness, he would testify that "in most instances, once a wife realizes that, under Rhode Island law, the husband must learn of the decision, she will decide to tell him herself." Stip. ¶ 6(n).

altogether. Stipulation of the Parties, ¶ 6(k), (j).

I also find, based on the evidence presented in this case, that the statute places other incidental burdens on a woman's decision to terminate her pregnancy. A forced notification of a woman's husband will put strain on an already unstable marriage. This single act may constitute a breaking point in the marriage. Affidavit of Rue. In addition, when a woman, for valid reasons of her own, is faced with mandatory notification of her husband, she may experience a level of stress which could significantly increase the risk level of an abortion procedure. Affidavit of Lowe.

The defendants in this case contend that even if forced notification results in the husband taking action to delay or frustrate his wife's decision to proceed with an abortion, that the burden is not imposed by the law itself. They argue that any action taken by a husband to obstruct his wife's abortion decision cannot be characterized as state action. The law, they urge, gives the husband no authority to interfere with the woman's choice or its effectuation; it does no more than perhaps influence a woman to select childbirth over abortion within the scope of state action held permissible under *Maher, supra.*

The defendants' argument that any burdens placed on a woman's right to an abortion are not the result of state action seems totally disingenuous. They fully concede that the purpose of this legislation is to ensure that a husband is afforded an opportunity to consult with his wife regarding the abortion decision. *See also* R.I. G.L. 23–4.8–1. This objective necessarily contemplates a delay in performing the abortion procedure whenever the husband is effectively notified. In addition, the state cannot logically eschew responsibility for the admitted fact that a husband, once notified, may prevent an abortion altogether. In such a case, but for the state action of requiring notification, the woman could freely effectuate her considered choice to obtain an abortion.

There can be no reasoned distinction between a law which mandates interference with or obstruction of the abortion decision and one which creates an opportunity which did not previously exist for third parties to obstruct or interfere with a pregnant woman's rights. The Supreme Court of the United States has rejected such a distinction through its holding in *Akron, supra.* In that case the Court invalidated an ordinance which required that the "attending physician" supply patients with pre-abortion information on the procedure, the inherent risks, and the necessary aftercare. *Akron,* 103 S.Ct. at 2502–2503. The Court found the provision to be burdensome in part because it created the possibility that some less ethical physicians would raise the price of the abortion for their services in providing the required information themselves. *Id.* at 2502.[8] The City of Akron ordinance clearly did not mandate a cost increase but merely created the opportunity for one to be charged. The Rhode Island spousal notification law, which facilitates a much more egregious interference with the abortion decision, unquestionably would be deemed burdensome under this analysis.

Finally, the defendants totally misapprehend the holding of *Maher, supra.* The legislation found to be nonburdensome in *Maher* was a law which disallowed abortion funding for the indigent. The lynchpin of the holding in that case was that the challenged legislation imposed no affirmative obstacles to abortion, but rather withheld government monies to finance the proce-

---

**8.** In determining the constitutionality of abortion regulation, the Court clearly indicated that a law which creates the opportunity for third party coercion of the abortion decision is constitutionally suspect. In *Matheson,* for instance, the Court, in upholding the parental notification requirement, emphasized the fact that the minor plaintiff had made no allegations concerning her fears of parental interference. *Matheson,* 450 U.S. at 407, 101 S.Ct. at 1170. In *Akron,* the Court noted that a constitutionally sound parental consent statute would have to provide a minor with an opportunity to completely "avoid hostile parental involvement." *Akron,* 103 S.Ct. at 2499 n. 31.

dure. *Maher,* 432 U.S. at 473–75, 97 S.Ct. at 2382–83. The critical distinction advanced in that case is conspicuously inapplicable to the Rhode Island law. The spousal notification provision is "a restriction on access to abortions that was not already there." *See id.* at 475, 97 S.Ct. at 2383. It affirmatively renders an abortion more difficult to obtain for a number of women, and as such, clearly imposes a burden under both *Maher* and *Harris.*

### D. *Is the Spousal Notification Law Supported By a Compelling State Interest*

After establishing that the Rhode Island spousal notification law burdens a woman's fundamental right to an abortion, this Court must determine whether the interference is justified by a compelling state interest. Although a state has a right, and in fact a duty, to exercise its police power for the protection and benefit of its citizenry, that police power may not routinely be invoked to override rights that have been deemed fundamental under the Constitution. Thus a fundamental right, while not absolute, may be interfered with only to serve a compelling state interest. *Roe, supra,* 410 U.S. at 154–55, 93 S.Ct. at 727. A state interest becomes compelling when its vindication is more crucial than the vindication of the fundamental right. *See Danforth, supra,* 428 U.S. at 67–72, 96 S.Ct. at 2840–42 (holding husband's interest in unborn child could not override wife's fundamental right to an abortion). I find the state of Rhode Island's proffered justifications for the spousal notification law do not constitute compelling state interests.

It is first necessary to isolate the state's objective in passing the legislation. The expressed purpose of the law as it appears on the face of the statute is "to promote the state's interest in furthering the integrity of the institutions of marriage and the family." R.I.G.L. § 23–4.8–1. In addition, the defendants maintain that the law serves the state's compelling interest in supporting the husband's parental and procreative rights in his unborn child. Defendants' Memorandum of Law in Support of Motion for Summary Judgment, p. 16.

These justifications, while they are legitimate subjects of state concern, are not among the compelling state interests which the Supreme Court has held to justify intrusion on an adult woman's right to an abortion. In *Roe, supra,* the Court held that states have a legitimate interest in regulating abortion to protect the health of the mother and the potentiality of human life. Even these admittedly legitimate interests, however, are not always compelling ones. Instead, each interest "grows in substantiality as the woman approaches term, and, at a point during pregnancy, each becomes 'compelling.' " *Roe,* 410 U.S. at 162–163, 93 S.Ct. at 731. The state's interest in maternal health reaches the compelling point at approximately the end of the first trimester, while the interest in potential life is compelling at the time of fetal viability. *Id.* at 163–165, 93 S.Ct. at 731–32. The language of Roe suggests that the compelling state interests it identifies are exhaustive.[9] Furthermore, no subsequent Supreme Court decision has indicated that there are additional state interests that could be deemed sufficiently compelling to override the fundamental right to an abortion.

Rhode Island's justification for the spousal notification law, under *Roe,* is clearly not compelling. It is not conceivable, nor is it even argued by the defendants, that the law in any way serves interests of maternal health or potential life. Finally, even if such an argument could be made, the Rhode Island statute applies to all abortion procedures performed on married women, including first trimester abortions. Thus, as applied to early procedures, even the interests identified in *Roe* would not suffice to justify the notice re-

---

**9.** In *Roe* the Court stated that the right to privacy as it protects the abortion decision is not absolute and is subject to some limitations: "... at some point the state interests as to the protec-

tion of health, medical standards, and prenatal life, become dominant." *Roe,* 410 U.S. at 155, 93 S.Ct. at 727.

quirement. *See Roe,* 410 U.S. at 164, 93 S.Ct. at 732.

Notwithstanding the clear implications of *Roe,* however, the defendants persist in arguing that the state's interest in family integrity and the husband's procreative potential are compelling in the abortion context. They contend that these interests have long been recognized by the Supreme Court as proper and important areas of state regulation. In addition, they seek support in a recent case upholding a parental notification law as being supported by a compelling state interest in preserving the integrity of the family. *See Matheson, supra,* 450 U.S. at 411, 101 S.Ct. at 1172. These lines of argument distort the function of strict judicial scrutiny and urge an unprincipled extension of a very narrowly drawn abortion regulation decision.

I acknowledge that states have an important and long recognized interest in the preservation of family integrity and the marriage institution. But the mere existence of such an interest does not render it sufficiently compelling to override a fundamental right. In *Danforth, supra,* the Supreme Court struck down a Missouri statute which required the prior written consent of the spouse of a woman seeking an abortion. The state of Missouri offered as justification for the statute state interests which are very similar to the ones offered by the defendants in this action. The Court described the state's defense of the law as follows:

> [I]t was enacted in light of the General Assembly's "perception of marriage as an institution," ... and that any major change in family status is a decision to be made jointly by the marriage partners. Reference is made to an abortion's possible effect on the woman's childbearing potential. It is said that marriage has always entailed some legislatively imposed limitations: Reference is made to adultery and bigamy as criminal offenses; to Missouri's general require-
>
> ment that for the adoption of a child born in wedlock the consent of both parents is necessary; to similar joint-consent requirements imposed by a number of states with respect to artificial insemination and the legitimacy of children so conceived; to the laws of two states requiring spousal consent for voluntary sterilization; and to the long-established requirement of spousal consent for the effective disposition of an interest in real property....

*Danforth,* 428 U.S. at 68, 96 S.Ct. at 2840.

The court, in holding the statute unconstitutional, recognized the potential effect of the abortion decision on the marriage institution as well as the state's interest in preserving that institution. *Id.* at 69–70, 96 S.Ct. at 2841. It found, however, that these interests were not sufficiently compelling to justify conditioning a woman's access to an abortion on her husband's consent. *Id.* at 71, 96 S.Ct. at 2842.

The defendants urge, however, that law requiring a spouse be notified of his wife's abortion decision cannot be equated with the spousal veto provision struck down in *Danforth.* They argue that the Rhode Island law, unlike a consent statute, does not interpose an absolute obstacle to the effectuation of a woman's abortion decision, and it may therefore be justified by the family integrity interests advanced in *Danforth.* This argument ignores the constitutional analysis which the Court has repeatedly undertaken in abortion regulation cases. Once it is established that a state law imposes a constitutionally significant burden on the right to an abortion, the state must advance a compelling state interest in curtailing the right. No case decided by the Supreme Court since *Roe* has held that the determination of whether a state interest is compelling is intertwined with the extent or degree of burden imposed on the fundamental right.[10]

---

**10.** Supreme Court decisions on the validity of parental consent and notification provisions illustrate that the Court has never subscribed to balancing the burden against the state interest to determine the constitutionality of burdensome abortion regulation. In *Bellotti* and *Matheson* the Court reached opposite conclusions on the constitutionality of two different

The defendants further argue that Supreme Court precedents which afford the institutions of marriage and the family heightened protection under the Constitution support the proposition that these interests are compelling in the abortion context. *See e.g., Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1964). They similarly urge that husbands have a constitutionally protected right to procreate under *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). This court would never attempt to refute the defendants' assertions that these rights are important ones. However, I must point out that the cases cited generally seek to protect these rights from state interference and intervention. As the Court stated in *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972):

> [T]he marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional make-up. If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.
>
> *Id.* at 453, 92 S.Ct. at 1038 (emphasis in the original).

The defendants in this case may not invoke these precedents to justify burdensome state intrusion into one of the very spheres of privacy which these cases seek to insulate.

parental involvement statutes. *Bellotti* held unconstitutional a provision which allowed for an absolute parental veto, while *Matheson* upheld a parental notification law as applied to immature and unemancipated minors. Although the defendants might argue that the divergent results in these two cases are attributable to an arguably "less significant burden" imposed on the right to abortion by the notification statute, that would simply be an incorrect characterization of the Court's analysis of those cases. In

Finally, the defendants seek support in the Court's decision in *Matheson, supra* for their assertion that the state's interest in family integrity justifies the Rhode Island statute. In *Matheson,* the Court upheld, as applied to an immature minor, a statute which required a physician to "notify, if possible," the parents or guardian of a minor on whom an abortion is to be performed. *Matheson,* 450 U.S. at 399–400, 101 S.Ct. at 1166. The Court found that the law was justified by two distinct compelling state interests: that of insuring family integrity and the protection of adolescents, and that of "providing an opportunity for parents to supply essential medical and other information to the physician." *Id.* at 411, 101 S.Ct. at 1172.

This case identifies unique state interests which are sufficient to justify burdening the right of a dependent, immature minor's right to an abortion. The recognition of these interests embraces the state's special duty to ensure the welfare of minors and the consequent, necessary limitation on the constitutional rights of children. The holding of *Matheson* can have no logical application to an adult woman's constitutional right to an abortion, and thus cannot be invoked to bolster the defendants' argument.

The compelling state interest in family integrity discussed in *Matheson* is an integral part of the single, indivisible concept of "family integrity and protecting adolescents." *Id.* This concept was first developed in *Bellotti, supra,* which addressed the validity of a statute requiring parental consent. The Court there discussed the factors which warrant special treatment of a minor's abortion decision. It stated:

> both cases, the Court undertook the analysis prescribed in *Roe;* both cases found that the respective statutes burdened the right to an abortion and both decisions found that a compelling state interest existed in the protection of minors. The conclusions differed, however, because the Court found that in *Matheson,* unlike in *Bellotti,* the statute was reasonably drawn to further those interests. *See Matheson,* 450 U.S. at 413, 101 S.Ct. at 1173.

We have recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing.

*Bellotti,* 443 U.S. at 634, 99 S.Ct. at 3043. Thus "the Court has repeatedly recognized that, in view of the unique status of children under the law, the States have a 'significant' interest in certain abortion regulation aimed at protecting children 'that is not present in the case of an adult.'" *Akron, supra,* 103 S.Ct. at 2491 n. 10 (quoting *Danforth, supra,* 428 U.S. at 75, 96 S.Ct. at 2843).

Finally, even the State's legitimate interest in encouraging parental involvement in their minor children's decision to have an abortion is not compelling as applied to *mature* minors. Notably, the Court's decision in *Matheson* was limited to upholding the law as it applied to immature, unemancipated minors. *Matheson,* 450 U.S. at 407, 101 S.Ct. at 1170. In *Akron,* the Court noted that a parental consent statute, to survive constitutional scrutiny, should make a provision for a mature or emancipated minor "completely to avoid hostile parental involvement" by demonstrating to a court that she is capable of making the abortion decision. *Akron,* 103 S.Ct. at 2499 n. 31. Certainly, then, if a state may not compel a mature minor to notify her parents notwithstanding its special and compelling interest in protecting children, it could not possibly, within the bounds of the Constitution, force a potentially hostile confrontation between a husband and wife.

The second compelling state interest alluded to in *Matheson* is even more obviously inapplicable to an adult woman seeking an abortion. In that case, the Court held that a state's interest in maternal health arguably justified a parental notification requirement since a parent might have access to important medical information about the minor of which she was unaware. *Matheson,* 450 U.S. at 441, 101 S.Ct. at

1188. It would be absurd to suggest that a husband could provide vital information to a woman's attending physician that she, herself, could not.

E. *Even if the State Interests in the Rhode Island Law Were Compelling, Is the Law Reasonably Drawn to Serve Those Interests*

My finding that the Rhode Island spousal notification law is not supported by a compelling state interest ends the constitutional inquiry—the statute is an unlawful burden on a woman's right to an abortion. However, even if this Court had found that Rhode Island had a compelling interest in vindicating values of "family integrity" and a husband's interest in procreation and the life of his unborn child, the law would still not survive strict scrutiny. If a compelling state interest is found, the court must still inquire if the challenged law is reasonably drawn to further the legitimate state end. *Akron,* 103 S.Ct. at 2495. I hold that the spousal notification statute is a totally irrational vehicle for achieving either of the state's purported goals.

It is true that an abortion regulation should not be held unconstitutional "simply because it does not correspond perfectly in all cases to the purported state interest." *Id.* at 2497. But it must be rationally calculated to serve those interests. Otherwise, once a state had demonstrated a compelling state interest, it could enact sweeping regulation that could obliterate any meaningful privacy right.

In *Akron,* the Court invalidated an ordinance requiring that all second trimester abortions be performed in a hospital. While the state certainly had a legitimate interest under *Roe* in regulating to ensure maternal health after the first three months of pregnancy, the ordinance was held an unreasonable method of vindicating that interest. It was the prevalent opinion of medical experts that a particular type of second-trimester abortion, the D & E procedure, could be performed safely on an outpatient basis in a properly equipped non-hospital setting. Consequently, the Court

concluded that "'present medical knowledge' convincingly [undercut] Akron's justification for requiring that *all* second-trimester abortions be performed in a hospital." *Id.* at 2496 (emphasis in the original) (footnotes and citations omitted).

The defendants have asserted a state interest in family integrity as one justification for the spousal notification provision. They argue that the statute is an appropriate means of furthering this interest because it ensures that the abortion decision, which affects both partners in a marriage, will be arrived at as a joint decision. This allegedly enhances the stability of the marital relationship on the theory that if a wife makes a unilateral decision of this magnitude, it will lead to marital discord if it is later discovered by the husband.

The defendants' expert concedes that, at least in rare situations, forced notification could cause a breaking point in a fragile relationship. Stip. ¶ 6(j). They urge, however, that a husband is likely to learn of the abortion after the fact in any event, and that the marriage will sustain less damage if the husband learns of his wife's unilateral decision before, rather than after the abortion. First, the plaintiffs have offered persuasive expert evidence that the husband will not learn of a wife's abortion unless she voluntarily chooses to tell him.[11] Thus forced notification can only be considered a lesser evil if compared to an eventuality which will probably never occur. Second, even if the defendants' tenuous arguments could be accepted, the fact remains that forced notification could not conceivably promote marital harmony.

The evidence presented by qualified experts in this case decisively demonstrates that Rhode Island spousal notification requirement will be more likely to undermine the stability of a marital relationship rather than protect and strengthen it. It was the unrefuted opinion of one of the plaintiffs' expert physicians that within healthy marriages the abortion decision is arrived at jointly between the partners, and thus in those cases, a forced notification requirement is unnecessary. It is the unstable or troubled marriages, and only those marriages, to which the statute would apply. Affidavit of Good. It is absurd to argue, as defendants seem to, that compelled notification in such a situation will assure the integrity of the marital institution. When a husband in an already troubled marriage learns through his wife's physician that his wife is about to undergo an abortion about which he has not been consulted, it is difficult to imagine that anything other than hostility, anger, or further alienation could result.

In holding as I do, I am not insensitive to the desirability of communication between a husband and wife on decisions of such potential magnitude as the abortion decision. The Supreme Court in *Danforth, supra,* however, put this factor in perspective with the important constitutional rights under consideration here. It stated:

> It seems manifest that, ideally, the decision to terminate a pregnancy should be one concurred in by both the wife and her husband. No marriage may be viewed as harmonious or successful if the marriage partners are fundamentally divided on so important and vital an issue. But it is difficult to believe that the goal of fostering mutuality and trust in a marriage, and of strengthening the marital relationship and the marriage institution, will be achieved by giving the husband a veto power exercisable for any reason whatsoever or for no reason at all. Even if the State had the ability to delegate to the husband a power it itself could not exercise, it is not at all likely that such action would further, as the

---

**11.** The defendants argue that because a woman is typically advised to abstain from sexual intercourse for two to three weeks following the abortion procedure, her husband will inevitably discover that the abortion has taken place. The plaintiffs, however, counter with persuasive expert testimony by an abortion counselor that women who wish not to inform their husbands of the abortion are counseled on how to avert suspicion during the post-procedure period of abstinence. The counselor further asserted that of those women who have been so counseled, none have reported that their husbands learned of the abortion. Affidavit of Merlin.

**642**

District Court majority phrased it, the "interest of the state in protecting the mutuality of decisions vital to the marriage relationship."

*Danforth*, 428 U.S. at 71, 96 S.Ct. at 2842 (citations omitted).

I believe that a forced notification requirement would be as deleterious to the marital relationship, if not more so, than the requirement of spousal consent condemned as unreasonable in *Danforth*.

Finally, I must assess the reasonableness of the Rhode Island law in light of the purported state interest of a husband's parental and procreative rights in his unborn child. I find that the spousal notification law is not reasonably drawn to serve that asserted interest. Logically, a state could vindicate such rights only by allowing the husband to override his wife's decision to terminate her pregnancy. The defendants themselves, however, have vigorously argued that the statute does not permit or even encourage such interference. Furthermore, spousal veto provisions were unequivocally held unconstitutional in *Danforth:* there the Court stated that although a caring husband may have a profound interest and concern in the fetus his wife carries, that interest is insufficient to override the wife's unilateral decision to have an abortion. *Danforth*, 428 U.S. at 71, 96 S.Ct. at 2842. Thus, because the mere notification of a husband that his wife is about to undergo an abortion does not give him license to prevent it, the Rhode Island statute cannot reasonably be said to further the husband's parental and procreative rights.

CONCLUSION

For the foregoing reasons, I hold that R.I.G.L. Chapter 23–4.8, the Spousal Notification requirement, is an unconstitutional violation of a woman's right to privacy in the abortion decision, and must therefore be stricken in its entirety. Accordingly, I find it unnecessary to reach the plaintiffs' equal protection claims.

An order will be prepared accordingly.